649 A.2d 853

JOHN RUMBAUSKAS, PLAINTIFF-RESPONDENT, v. EDWARD
A. CANTOR, DEFENDANT-APPELLANT.

Argued September 12, 1994—Decided November 30, 1994.

*Shalom D. Stone* argued the cause for appellant (*Walder, Sondak & Brogan,* attorneys; *Justin P. Walder* and *John A. Brogan,* of counsel).

*Kenneth K. Lehn* argued the cause for respondent (*Franzblau Dratch,* attorneys).

The opinion of the Court was delivered by

O'HERN, Justice.

In an earlier time, the great Judge Wilfred Jayne might have written of this case: "In several of its aspects this cause is an unfashionable one to be introduced to a court * * * for determination." *Tami v. Pikowitz,* 138 *N.J.Eq.* 410, 410, 48 *A.*2d 221 (Ch.1946). An innocuous rivalry between two suitors of a woman is ordinarily not the business of the law. In this case, however, what began as mere harassment of a rival suitor escalated into stalkings and threats to kill. Fortunately, the processes of criminal law intervened to save plaintiff from physical violence.

## I

This civil action seeks monetary damages for invasion of privacy. The legal issue presented by this appeal is whether the tort of intrusion on seclusion is an "injury to the person" barred by the two-year limitation period set forth in *N.J.S.A.* 2A:14–2 or is an "injury to the rights of another" barred by the six-year limitation period set forth in *N.J.S.A.* 2A:14–1. Because this case arises on defendant's motion to dismiss the complaint, we must accept as true plaintiff's version of the events.

Several years prior to defendant's alleged conduct, plaintiff, John Rumbauskas, had become friendly with a fellow worker to whom we shall refer as "Sally Jamieson." A romantic relationship developed between them. In November 1982, Jamieson went to work for businesses owned and managed by defendant, Edward A. Cantor. Cantor made romantic overtures toward her. These advances were particularly intense throughout 1984. Cantor showered Jamieson with lavish gifts in his effort to convince her to engage in an intimate relationship with him. He pressured Jamieson to wed him and was intensely jealous of Rumbauskas' relationship with her. Rumbauskas knew that, yet he remained romantically involved with Jamieson during that time.

Cantor's unsuccessful attempts to establish a sexual relationship with Jamieson led to physical threats and harassment directed at both Jamieson and Rumbauskas. In December 1984, Cantor

showed a $50,000 roll of money to Jamieson and told her that if she ever saw Rumbauskas again, he would use the $50,000 to hire someone to kill both her and Rumbauskas. Additionally, Cantor later staged a meeting, in Jamieson's presence, with an asserted accomplice and intimated to Jamieson that he had hired the accomplice to kill Rumbauskas. Further, agents of Cantor stalked Jamieson's premises. Cantor later told Jamieson that Rumbauskas was lucky he had not been at her home on that occasion because his agents had been waiting for him.

Even after Jamieson quit working for Cantor's organization in January 1985, Cantor continued to harass her. He told Jamieson that he would make sure she was never employed again. He posted encoded signs on his property deriding Rumbauskas and escalated his threats against Rumbauskas, again suggesting to Jamieson that Rumbauskas might be killed.

Between 1986 and 1988, anonymous telephone threats were made to Rumbauskas directing him to stay away from Jamieson. He was told that if he did not follow that directive, his legs would be broken and his relatives would have a funeral to attend. Cantor also enlisted John Riggi, a reputed member of organized crime, to "persuade" Rumbauskas to stop seeing Jamieson and have her return certain jewelry and gifts she had received from Cantor.

During that time, Rumbauskas noticed automobiles continually parked across the street from his home, the same vehicles that had followed him. In fact, in 1987, an unidentified vehicle forced Rumbauskas off the road.

The New Jersey State Police intervened, pursuant to a separate criminal investigation of Cantor, and confirmed that Rumbauskas was indeed under surveillance. Moreover, he was the intended victim of a "contract murder" financed by Cantor. Once Cantor was arrested, the telephone threats and other intimidation tactics ceased.

Plaintiff's complaint alleged that the foregoing outrageous conduct constituted "an unreasonable intrusion into [plaintiff's] right to live free of [defendant's] interference, threats, surveillance, extortion or duress, and constitute[d] an invasion of [plaintiff's] right to privacy." Plaintiff sought compensatory and punitive damages. He later limited his compensatory damage claim to economic loss and did not seek damages for physical or emotional injuries. (Plaintiff also asserted a cause of action against Cantor for his involvement in "racketeering activity" in violation of *N.J.S.A.* 2C:41–1(a) and *N.J.S.A.* 2C:41–1(d), but those issues are not before us.) The trial court dismissed the complaint for invasion of privacy. It reasoned that such an action, specifically an intrusion on seclusion, is an action for personal injury because mental distress constitutes part of the measure of damages for such a tort. Therefore, the trial court concluded that this case involved an action for "an injury to the person" governed by the two-year limitation period set forth in *N.J.S.A.* 2A:14–2.

On appeal, the plaintiff contended that the trial court had confused the nature of the injury with the nature of the resultant damages and therefore had overlooked the distinction between "an injury to the person," as set forth in *N.J.S.A.* 2A:14–2, and "tortious injury to the rights of another," as set forth in *N.J.S.A.* 2A:14–1. Plaintiff alleged that he had taken circuitous routes to and from work to avoid harassing surveillance. Thus, plaintiff claimed that he had incurred additional expenses for fuel and had subjected his car to wear and tear. Plaintiff also alleged that he had purchased a baseball bat for protection and had missed several days of work due to threats and intimidation. Further, plaintiff alleged that his livelihood had been jeopardized by defendant's threats to purchase the company for which he worked. The point of those allegations was to demonstrate that plaintiff had suffered damages unrelated to any "injury to the person."

The Appellate Division agreed. It reasoned that

[t]he two-year limitations statute does not apply to injury to *a* person, but to injury to *the* person. Because the right to damages for the harm to plaintiff's interest in privacy * * * does not relate to any physical or emotional injury, it is

not "an injury to the person" and is therefore not governed by the two-year limitations period.

[266 *N.J.Super.* 399, 405, 629 *A.*2d 1359 (1993).]

We granted defendant's petition for certification, 134 *N.J.* 565, 636 *A.*2d 522 (1993), to review the reinstatement of the claim.

## II

Recently, in *Montells v. Haynes,* 133 *N.J.* 282, 627 *A.*2d 654 (1993), we determined the appropriate statute of limitations applicable to actions under *N.J.S.A.* 10:5–13, the Law Against Discrimination (LAD). The case had arisen from a sexual-harassment claim filed by Montells against her supervisor, employer, and various company managers. Finding that injuries under LAD are most like personal injury claims, we concluded that the two-year personal-injury statute of limitations applied. *Id.* at 292, 627 *A.*2d 654.

In analyzing whether injuries under LAD are like "an injury to the person" under *N.J.S.A.* 2A:14–2 or like injuries under *N.J.S.A.* 2A:14–1 that arise from "any tortious injury to the rights of another not stated in section[ ] 2A:14–2 * * *," we reasoned that the Legislature "essentially distinguished personal injuries involving physical or emotional harm from those involving economic harm." *Id.* at 291, 627 *A.*2d 654. We concluded that "[a]lthough LAD similarly vindicates economic rights and some rights that sound in contract, the statute strikes directly at conduct that injures the personhood of another. A discrimination claim cuts most deeply at the personal level." *Id.* at 293, 627 *A.*2d 654.

In *Montells,* however, we cited with approval *Canessa v. J.I. Kislak, Inc.,* 97 *N.J.Super.* 327, 235 *A.*2d 62 (Law Div.1967), which held that the six-year statute of limitations applied to an invasion-of-privacy claim. *Montells, supra,* 133 *N.J.* at 292, 627 *A.*2d 654. Canessa had encountered serious difficulties in finding an apartment or house to rent because he and his wife had eight children. Canessa therefore employed the services of the J.I. Kislak Corporation (Kislak) to assist him in procuring housing via the G.I. bill.

In the course of that relationship, a newspaper ran the story about Canessa's plight. Kislak reprinted that news account, accompanied by a photograph, on its commercial stationery. It distributed those reprints to its customers to show the good efforts that it had made for a veteran, for the purpose of advancing its commercial interest. *Canessa, supra,* 97 *N.J.Super.* at 331–32, 235 *A.*2d 62.

The *Canessa* court, after analyzing numerous cases attempting to clarify the concept of the tort of invasion of privacy, concluded:

> Entirely apart, however, from the metaphysical niceties, the reality of a case such as we have here is, in the court's opinion, simply this: plaintiffs' names and likenesses belong to them. As such they are property. They are things of value. Defendant has made them so, for it has taken them for its own commercial benefit.
>
> [*Id.* at 351, 235 *A.*2d 62.]

In an exhaustive and scholarly analysis of what statute of limitations should apply to actions for an invasion of privacy, the *Canessa* court took note of historic case-law discussions of the differences between the two-year statute of limitations and the six-year statute of limitations, specifically, the common-law distinctions between trespass *vi et armis* and trespass on the case. *Id.* at 354–55, 235 *A.*2d 62. It reflected on the distinctions that have been made in a series of cases involving suits for malicious prosecution and suits for alienation of affections. *Id.* at 353–54, 235 *A.*2d 62. In such suits, some of the major elements of damages are humiliation, embarrassment, mental suffering, and wounded sensibilities. *Id.* at 353, 235 *A.*2d 62. Nonetheless, courts have concluded that such actions do not involve injuries to the person because their " 'gist * * * is for an injury to the *personal rights as distinguished from injuries to the person.'* " *Ibid.* (quoting *Kearney v. Mallon Suburban Motors, Inc.,* 23 *N.J.Misc.* 83, 88, 41 *A.*2d 274 (Essex Cty.Ct.1945) (emphasis added)).

■ The problem with applying *Canessa* to this case is that invasion of privacy

> "is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together

by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff 'to be let alone.'" [*Id.* at 334, 235 *A*.2d 62 (quoting William L. Prosser, *The Law of Torts* § 112 (3d ed. 1964)).]

The four classifications that Dean Prosser propounded are: (1) intrusion (*e.g.*, intrusion on plaintiff's physical solitude or seclusion, as by invading his or her home, illegally searching, eavesdropping, or prying into personal affairs); (2) public disclosure of private facts (*e.g.*, making public private information about plaintiff); (3) placing plaintiff in a false light in the public eye (which need not be defamatory, but must be something that would be objectionable to the ordinary reasonable person); and (4) appropriation, for the defendant's benefit, of the plaintiff's name or likeness. W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 117 (5th ed. 1984).

In his explanation of the four types of invasions of privacy, Prosser has noted:

It should be obvious at once that these four types of invasion may be subject, in some respects at least, to different rules; and that when what is said as to any one of them is carried over to another, it may not be at all applicable, and confusion may follow.

[William L. Prosser, *Privacy*, 48 *Cal.L.Rev.* 383, 389 (1960).]

Prosser adds that almost all the confusion in the area is caused by the failure to separate and distinguish the four forms of invasion of privacy and to realize that they call for different treatment. *Id.* at 407, 235 *A*.2d 62. Thus, to conclude that *Canessa, supra,* which involves the fourth form of invasion, *i.e.,* appropriation for the defendant's advantage of the plaintiff's name or likeness, is applicable to the circumstances of this case would be premature.

Jurisdictions throughout the country have struggled with the classification of actions for invasion of privacy. One of the most familiar difficulties is determining whether placing one in a false-light in the public eye should be regarded as defamatory in nature, thereby subjecting causes of action to the specific statutes of limitations applicable to defamation claims. For example, because of the inherent similarities between false-light and defamation claims, the Supreme Court of Washington concluded that the same

statute of limitations applies to both types of claims. *Eastwood v. Cascade Broadcasting Co.*, 106 *Wash.*2d 466, 722 *P.*2d 1295, 1299 (1986). Similarly, the Supreme Court of California recognized the inherent similarities between false light invasion of privacy and defamation in *Fellows v. National Enquirer, Inc.*, 42 *Cal.*3d 234, 228 *Cal.Rptr.* 215, 225 n. 12, 721 *P.*2d 97, 106 n. 12 (1986). *See also Covington v. The Houston Post*, 743 *S.W.*2d 345, 348 (Tex.Ct. App.1987) (holding that personal injury statute of limitations applied to false light defamation).

In *Slack v. Kanawha County Housing and Redevelopment Authority*, 188 *W.Va.* 144, 423 *S.E.*2d 547, 551 (1992), the court categorized invasion of privacy as a personal action that dies with the holder and therefore impliedly concluded that invasion of privacy is not a personal injury. However, in *Canino v. New York News, Inc.*, 96 *N.J.* 189, 198, 475 *A.*2d 528 (1984), we noted that "at common law an action for libel or slander was considered a trespass to the person * * *." Therefore, we determined that such an action survives the death of the person claiming injury. *Ibid.*

Regarding the question of whether invasion of privacy premised on intrusion on seclusion is governed by a personal-injury statute of limitations, the courts throughout the country are similarly divided. *See* Annotation, *Limitation of Actions: Invasion of Right of Privacy*, 33 *A.L.R.*4th 479, 481 (1984 & Supp.1994). For example, in *Jones v. Hudgins*, 163 *Ga.App.* 793, 295 *S.E.*2d 119, 122 (1982), the court determined that an action for invasion of privacy based on intrusion on seclusion premised on recordation of telephone conversations was governed by the two-year statute of limitations for personal injuries rather than the four-year statute of limitations for property rights.

The court in *Jones* relied on *Hull v. Curtis Publishing Co.*, 182 *Pa.Super.* 86, 125 *A.*2d 644 (1956), which said that

[a]s Roscoe Pound has written * * *: "A man's feelings are as much a part of his personality as his limbs. The actions that protect the latter from injury may well be made to protect the former by the ordinary process of legal growth."

[*Id.* 125 *A.2d* at 649 (quoting Roscoe Pound, *Interests of Personality,* 28 *Harv.L.Rev.* 343, 363–64 (1915)).]

*See also Bernstein v. National Broadcasting Co.,* 129 *F.Supp.* 817, 825 (D.D.C.1955), *aff'd,* 232 *F.*2d 369 (D.C.Cir.), *cert. denied,* 352 *U.S.* 945, 77 *S.Ct.* 267, 1 *L.Ed.*2d 239 (1956) (finding that injury affecting sensibilities is as much an injury to person as injury to body). Concededly, those aphorisms are difficult to apply in the many contexts in which an invasion by intrusion may arise. The *Restatement (Second) of Torts* § 652B, comment b, illustrations 1–5 (1977), provides five examples of invasion by intrusion. Briefly, those are: a reporter takes the plaintiff's picture in a hospital room against the plaintiff's wishes; a private detective looks into the plaintiff's windows and takes intimate pictures with a telescopic lens; a private detective wiretaps the plaintiff's phones; the defendant examines the plaintiff's bank records for evidence in a civil action; and the defendant, a professional photographer, telephones the plaintiff repeatedly to convince her to have her picture made.

Some of those examples contain elements of trespass to property. However, in most circumstances, the plaintiff's complaint is for the invasion of privacy, not the trespass on property. See *Magenis v. Fisher Broadcasting, Inc.,* 798 *P.*2d 1106, 1107–08 (Or.Ct.App.1990) (filming of police raid on plaintiffs' property was asserted basis for claim of invasion of privacy).

Entirely apart from metaphysical niceties, the reality of a case such as this is simply that defendant's conduct struck directly at the personhood of plaintiff. *Canessa, supra,* 97 *N.J.Super.* at 351, 235 *A.*2d 62. Here, like the claim in *Montells, supra,* 133 *N.J.* at 293, 627 *A.*2d 654, defendant's conduct "cuts most deeply at the personal level." Accordingly, we hold that an action for intrusion on seclusion that is premised on conduct such as the stalkings or threats of violence present here constitutes a claim for "injury to the person" of the plaintiff and is governed by the two-year statute of limitations set forth in *N.J.S.A.* 2A:14–2.

The limitation periods applicable to actions involving other types of invasion of privacy are not before us. Invasion-of-privacy actions based on appropriation remain governed by the six-year statute of limitations period set forth in *N.J.S.A.* 2A:14–1. *See Canessa, supra,* 97 *N.J.Super.* at 395, 235 *A.2d* 62. Regarding actions for public disclosure of private facts or placing one in a false light, case law in other jurisdictions indicates that such actions are subject to the limitations period for defamation claims, which is one year in New Jersey. *N.J.S.A.* 2A:14–3. In this case it is regrettable that plaintiff did not institute his action within two years of the injury complained of.

We reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.